**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:24-cv-81151-AMC

**JORGINA LULU GUILLERMO DIAZ, on behalf of herself and her minor daughter JANE DOE,**

*Plaintiff*,

v.

**DANIEL HERNANDEZ**,
**a/k/a 6ix9ine,**
**a/k/a Tekashi69,**
**OSCAR HERNANDEZ,**
**MOHAMED B. ZAIED, and**
**CLIQ MANAGEMENT LLC,**

*Defendants*.

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jorgina Lulu Guillermo Diaz, professionally known as Yailin La Más Viral ("Plaintiff"), on behalf of herself and her infant daughter ("Jane Doe"), by and through her counsel Reed Smith LLP, files this Second Amended Complaint against Defendants Daniel Hernandez (also known as 6ix9ine or Tekashi69), Oscar Hernandez, Mohamed B. Zaied, and Cliq Management LLC ("Cliq Management") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. This action seeks to hold Daniel Hernandez accountable for the physical, sexual, emotional, and financial abuse and exploitation of Plaintiff, his former girlfriend, as well as Plaintiff's infant daughter Jane Doe, and for the financial fraud

that he has committed. Plaintiff also seeks to hold all Defendants accountable for the financial fraud they wrought upon her.

2. Daniel Hernandez, a prominent rapper performing under the stage names 6ix9ine or Tekashi69, has a lengthy history of engaging in violent criminal conduct, as well as physical and sexual abuse. Among other crimes, in 2015, Daniel Hernandez pled guilty to use of a minor in a sexual performance, a felony; in 2019 Daniel Hernandez pled guilty to various federal offenses, including racketeering, firearms, and narcotics charges with gang involvement; and Daniel Hernandez has been arrested multiple times for assault and domestic violence. Daniel Hernandez has avoided decades-long prison sentences only by testifying against fellow gang members about crimes in which he participated, as well as other crimes, causing them to serve lengthy prison sentences in his stead.[1]

3. Throughout and after his relationship with Plaintiff, Daniel Hernandez has waged an appalling campaign of abuse against her – seeking to dominate, control, and harm her; alienate her from her family and friends; and rob her of her hard-earned money, including, drugging her on multiple occasions to further his scheme to defraud.

4. Daniel Hernandez, unbeknownst to Plaintiff, used these misappropriated funds to pay for luxury expenses, while manipulating, shaming, and coercing Plaintiff to undergo unnecessary plastic surgery and other cosmetic

---

[1] https://www.foxnews.com/entertainment/tekashi-6ix9ine-69-associates-convicted-of-racketeering-conspiracy-in-gang-case-after-rappers-testimony

procedures. Plaintiff did not and would not have authorized these expenses had she known that Defendants were paying for them with her money.

5. Daniel Hernandez did all this by exerting psychological, emotional, and industry-access power and control over Plaintiff, often coercing her to take drugs in aid of controlling her and depriving her of her independence, and causing her to feel oppressed, isolated, and fearful, all for his own benefit physically and financially, and for other as-yet-unknown purposes.

6. Plaintiff's recent discovery that Daniel Hernandez had been stealing huge sums of money from her since the beginning of their relationship, coupled with his physical and sexual abuse, forced isolation, manipulation, gaslighting, and controlling behavior proved to be the last straw.

7. Upon learning of Daniel Hernandez's theft and fraud in approximately August 2024, Plaintiff ended their relationship, both personal and professional.

8. In a final act of abuse, seeking to retaliate against Plaintiff and to reassert control over Plaintiff when she told him their relationship was over – and when his access to her money was cut off – Daniel Hernandez appallingly and unlawfully posted private, intimate, and sexually explicit videos and photographs of Plaintiff on X/Twitter without her consent.

9. After Plaintiff's management team tried to have these deeply personal videos and photographs removed from X/Twitter, Daniel Hernandez deviously and unlawfully sought to re-publish them – which he shamefully succeeded in doing mere days before the filing of the initial complaint in this case.

10. Plaintiff brings this litigation to vindicate her rights and her personhood; and to demonstrate to a violent, predatory abuser that she will not be controlled or intimidated.

11. Plaintiff is entitled to be made whole for Daniel Hernandez's long pattern of theft and abuse, and to hold Daniel Hernandez and his co-conspirators accountable for their atrocious conduct, via all remedies and penalties the law affords.

## PARTIES

12. Plaintiff Jorgina Lulu Guillermo Diaz, professionally known as Yailin La Más Viral, is an individual who resides in, and is a citizen of, the Dominican Republic. She is a professional singer and rapper. Jane Doe is a citizen of the Dominican Republic. Plaintiff is mother to an infant daughter, hereinafter referred to as Jane Doe, who is not the child of Daniel Hernandez.

13. Defendant Daniel Hernandez, professionally known as 6ix9ine or Tekashi69, is an individual domiciled in, and is a citizen of, the State of Florida. He is a prominent rapper and social media personality.

14. Defendant Oscar Hernandez is Daniel Hernandez's brother. Oscar Hernandez is domiciled in, and is a citizen of, the State of Florida.

15. Defendant Mohamed B. Zaied ("Zaied") is domiciled in, and is a citizen of, the State of Florida.

16. Defendant Cliq Management LLC is a limited liability company created and operating under the laws of Florida. Each of Cliq Management's members is domiciled in, and is a citizen of, the State of Florida.

## JURISDICTION AND VENUE

17. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises from the laws of the United States, specifically 15 U.S.C. § 6851, and the causes of action under state law alleged herein arise from a common nucleus of operative fact.

18. In addition, this Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2), because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

19. Venue is properly placed in this district pursuant to 28 U.S.C. § 1391(b)(1), because Daniel and Oscar Hernandez reside in this District; and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### I. Daniel Hernandez Maneuvers Himself into Plaintiff's Personal and Professional Life

20. Plaintiff is an up-and-coming Dominican rapper and singer, who rose to prominence in the last several years through numerous music releases and social media publicity.

21. Daniel Hernandez and Plaintiff began dating in or about April 2023. Daniel Hernandez deliberately approached Plaintiff at a vulnerable time. In the Spring of 2023, Plaintiff was divorcing her former partner and the father of Jane Doe, Emmanuel Gazmey Santiago p/k/a Anuel AA, another prominent Latin music

performer ("Anuel AA"). Anuel AA had once been a close friend of Daniel Hernandez's, until Daniel Hernandez became a U.S. law enforcement informant.

22. As Defendants were aware, Plaintiff did not speak English, was young, inexperienced, caring for an infant daughter, uncertain about the future, saddled with familial troubles, and trying to navigate the complexities of her career, finances, and the music industry, including in the U.S.

23. Daniel Hernandez was aware that Plaintiff and Anuel AA were divorcing. Thus, Daniel Hernandez contacted Plaintiff via social media messages in or about April 2023, proposing that they collaborate professionally and offering Plaintiff gifts, promotional assistance, and other benefits – all without cost to Plaintiff. Daniel Hernandez induced Plaintiff to begin a relationship using this "love-bombing" approach.

24. Daniel Hernandez and Plaintiff did in fact release a collaborative work entitled "Pa Ti" in 2023. However, Daniel Hernandez has improperly withheld all compensation Plaintiff is entitled to receive for the tens of millions of streams this song has generated.

## II. Daniel Hernandez's Physical, Emotional, and Sexual Abuse of Plaintiff

25. Daniel Hernandez physically, emotionally, and sexually abused Plaintiff throughout their relationship.

26. At first, Daniel Hernandez concealed his overtly violent tendencies, while simultaneously working to isolate Plaintiff from her family, friends, and other sources of support. This made Plaintiff more dependent on him, vulnerable to his

control, and without recourse when he escalated his abuse – tragically familiar patterns that abusers consciously exploit.

27. Among other things, Daniel Hernandez worked to convince Plaintiff – whose music had already found success – that those around her were exploiting her and stealing from her. Daniel Hernandez presented himself as a contrast to such "false friends," insisting that he would take care of her financially. Classic gaslighting, since ironically, as Plaintiff eventually learned, it was Daniel Hernandez and the other Defendants who were stealing from her, exploiting her, and lying to her.

28. After Daniel Hernandez and Plaintiff began dating, Daniel Hernandez began to openly flaunt his true nature, including physically attacking Plaintiff, stealing from her, and drugging her.

29. For instance, in or about June 2023, Daniel Hernandez struck Plaintiff in the face when the two were staying together at the Marriot Marquis Hotel in Times Square in New York City.

30. The next day, while Daniel Hernandez and Plaintiff were in flight on a private plane from New York to Florida, Daniel Hernandez continued to violently attack Plaintiff. There were multiple witnesses to the attack, including at least one of the pilots who was paid off after threatening to call the police.

31. On or about August 23, 2023, at the baptism of Jane Doe in the Dominican Republic, Daniel Hernandez punched Plaintiff and threatened to throw her from a balcony in front of Plaintiff's family and friends.

32. In or about October 2023, Plaintiff was standing in the driveway of Daniel Hernandez's property in Palm Beach County when Daniel Hernandez, who was seated in the driver's seat of his vehicle, intentionally and purposefully accelerated the vehicle quickly in her direction, terrifying her and causing her to fall and sustain injuries. Plaintiff's injuries resulted in her being airlifted to the hospital to receive treatment.

33. While Plaintiff and Daniel Hernandez were at a Miami nightclub in December 2023, Plaintiff argued with Daniel Hernandez over his interactions with another woman at the club, and Daniel Hernandez pushed Plaintiff off a sofa and struck her in the face. Daniel Hernandez continued to abuse Plaintiff while the two were together at his house the following day.

34. Daniel Hernandez's constant manipulation, gaslighting, and abuse caused Plaintiff severe emotional distress. Indeed, in December 2023 – the day after Daniel Hernandez assaulted Plaintiff at a Miami nightclub – Daniel Hernandez held Plaintiff hostage in his home in Florida, hiding her passport, and refusing to give her access to her phone or her money.

35. On December 14, 2023, Daniel Hernandez and his security team (including at least one person armed with a gun) wrongfully imprisoned Plaintiff on Daniel Hernandez's secured property in Palm Beach County. When Plaintiff insisted that they return her passport and money and allow her to leave, they refused. Plaintiff had no ability to leave the gated community, which required Daniel Hernandez's authorization for entrance and exit. Plaintiff – understandably

distraught, angry, and desperate – lashed out, damaging Daniel Hernandez's car and briefly scuffling with him in hopes to call attention to her confinement. Daniel Hernandez called the police, and Plaintiff was arrested.

36. Daniel Hernandez used the incident as additional leverage to control Plaintiff, by calling U.S. Customs and Immigration Service and successfully prevailing upon the agency to revoke Plaintiff's visa in light of the arrest. However, all charges against Plaintiff for this incident were dismissed in February 2024.

37. On May 8, 2024, Daniel Hernandez celebrated his birthday by arranging a trip to the Dominican Republic for his friends and family. On that date, Daniel Hernandez assaulted Plaintiff, punching her in the face – causing, amongst other injuries, a swollen and black eye. The below photograph was taken shortly after the assault.



38. For the avoidance of any doubt, these instances of violent physical abuse are not exhaustive. Daniel Hernandez began physically abusing and assaulting Plaintiff early in their relationship, and thereafter, continuously abused her throughout their 18-month relationship until the relationship ended in approximately August 2024.

39. To control Plaintiff emotionally, Daniel Hernandez would tell Plaintiff she was to blame for his violence toward her. Specifically, Daniel Hernandez insisted that his violence against her was justified, and that Plaintiff had a mental illness that left her unable to correctly remember the "reasons" for his violent acts. Although

Plaintiff at times took pictures of her injuries, documenting Daniel Hernandez's physical abuse, Daniel Hernandez would frequently access Plaintiff's phone without her consent and delete the photographs.

40. Daniel Hernandez regularly violated Plaintiff's privacy through abuse of her social media accounts, controlling even her private interactions. For instance, Daniel Hernandez regularly accessed Plaintiff's Instagram account and deleted her content without her consent. Daniel Hernandez changed the email address associated with all of Plaintiff's social media accounts and streaming platform accounts to one he controlled, giving Daniel Hernandez access to all of Plaintiff's social media information while denying her access. This gave Daniel Hernandez far-reaching power over Plaintiff's social interactions and professional life. Indeed, so far it has proven impossible for Plaintiff to detach some of her social media and streaming accounts completely from Daniel Hernandez's control.

41. Daniel Hernandez also escalated his emotional abuse of Plaintiff by frequently telling her that she was worthless without him; that her managers and others around her were stealing millions of dollars from her and could not be trusted; that she was dependent on Daniel Hernandez because no other partner would be interested in Plaintiff; and that if she did not do as she was told, Daniel Hernandez would publicly release intimate videos he had obtained from Plaintiff without her consent through their romantic relationship.

42. Daniel Hernandez followed through on his threat to publish sexually explicit videos and images of Plaintiff that were taken and posted without her consent.

43. For example, after Plaintiff performed live on June 24, 2023 at the United Palace, a theater in New York City, Daniel Hernandez harshly criticized Plaintiff's performance and convinced her to return to Miami. During the flight to Miami, Daniel Hernandez recorded himself and Plaintiff having sexual intercourse without her consent. Daniel Hernandez, who was the only person in possession of the video, then leaked a shot from the video to the public, without Plaintiff's consent. Specifically, Daniel Hernandez, purporting to share a separate image on his Instagram account, cunningly also showed a preview of his phone's recent photo album, including the explicit video he recorded of Plaintiff.

44. Plaintiff was distraught and furious upon learning of the existence of the video and the leak and pleaded with two of her advisors to come to Miami to rescue her, however, Daniel Hernandez convinced Plaintiff that he had not been responsible for the leak and that her managers were hostile to her and should not pick her up.

45. As alleged further below, after Plaintiff ended her relationship with Defendant, Defendant retaliated against her by publishing clips from explicit videos he took of Plaintiff without her knowledge and consent.

## III. Defendants Exploit and Steal from Plaintiff

46. Before meeting Daniel Hernandez, Plaintiff entered into a distribution agreement (the "Distribution Agreement") with Equity Distribution LLC.

47. Defendants played no role in obtaining or negotiating the Distribution Agreement.

48. As they were aware, Defendants had no rights to any funds from the Distribution Agreement or any of Plaintiff's funds, property, or assets.

49. Pursuant to the Distribution Agreement, Plaintiff was entitled to payments totaling at least $350,000.

50. On or about May 2023, Equity Distribution LLC transferred $290,000 (the "Distribution Agreement Funds") of the at least $350,000 owed Plaintiff under the Distribution Agreement to Iris Live Music LLC ("Iris Live") for Plaintiff's benefit.

51. At that time, Plaintiff was newly divorced, had an infant daughter, had limited cash, no bank account, no financial experience, and virtually no experience dealing in U.S. contracts or law, and she was not a U.S. citizen and did not speak English. Moreover, Daniel Hernandez's physical, mental, and sexual abuse and coercion of Plaintiff had left her weakened and vulnerable. Knowing all of this, Defendants sought to prey on Plaintiff's desperation and naivete.

52. Touting his experience and connections in the industry, and with intent to isolate Plaintiff from anyone that could actually help her or uncover Defendants' scheme, Daniel Hernandez convinced Plaintiff that Equity Distribution LLC and Iris

Live could not be trusted and were wrongfully withholding her money, which Defendants wanted for themselves.

53. Daniel Hernandez told Plaintiff that he trusted Oscar Hernandez and Zaied to take care of his affairs, including his management and finances. Accordingly, he said that he would help Plaintiff by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

54. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez's brother (Oscar) and friend/business partner (Zaied), would help her and would not take acts to defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

55. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had Plaintiff's funds transferred to an account held by their company, Cliq Management. Defendants then proceeded to spend Plaintiff's funds on themselves. Defendants did all of this without Plaintiff's knowledge or consent.

56. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

57. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. At all relevant times, Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

58. That same month, Oscar Hernandez traveled to the Dominican Republic to coerce Plaintiff to sign a supposed management agreement with Cliq Management (the "Cliq Agreement").

59. As Daniel and Oscar Hernandez were aware, Plaintiff was drinking alcohol at that party, such that she was incapacitated. In fact, Daniel and Oscar Hernandez encouraged Plaintiff to drink more and then intentionally waited to present her with the signature page of the Cliq Agreement when she was incapacitated, unable to detect their deceit, and unable to understand or even reasonably inquire about what they were asking her to sign.

60. While Plaintiff was incapacitated, Daniel and Oscar Hernandez presented Plaintiff with only the signature page of the Cliq Agreement.

61. Daniel and Oscar Hernandez falsely represented to Plaintiff that the Cliq Agreement was a document she needed to sign for the bank – like a bank signature card – to open her new bank account in the U.S.

62. Incapacitated, and relying on Daniel and Oscar Hernandez's false representations, Plaintiff signed the signature page of the Cliq Agreement.

63. At that time, Plaintiff also was in the throes of physical, emotional, and sexual abuse; gaslighting and manipulation; and frequent drugging at the hands of Daniel Hernandez; ensuring that Plaintiff was at Defendants' mercy. Defendants sought to exploit Plaintiff's vulnerable state.

64. It is unclear what the Cliq Agreement is or what its terms are, if any. Plaintiff did not see the Cliq Agreement, assent to its terms, or even know of its existence until recently, when she obtained pages from a document that may be part of what Defendants claim is the Cliq Agreement. But it is unclear whether those pages even existed at the time of Plaintiff's signature or whether the Cliq Agreement was anything more than just a signature page, to which Defendants intended to draft, edit, and attach any terms that suited them, including as necessary after the fact to try and justify their malfeasance. Based on the pages Plaintiff obtained, it appears that Defendants were trying fraudulently to make it appear that Plaintiff had authorized Cliq Management to become her manager.

65. Plaintiff did not hire, contract, or agree to pay any Defendant to perform any services. Defendants did not perform managerial services for Plaintiff, and they were not entitled to her money. Any assistance that Defendants provided Plaintiff

was as a favor because Plaintiff and Daniel Hernandez were in a relationship and because Plaintiff's association with Daniel Hernandez benefited Defendants. Defendants sought to capitalize on those benefits.

66. Chillingly, Plaintiff would later discover that supposed pages from the Cliq Agreement included a clause purporting to authorize Cliq Management, including Daniel Hernandez, to take out a life insurance policy on Plaintiff, with Daniel Hernandez as the beneficiary. This clause gave Plaintiff's violent abuser a perverse financial interest in Plaintiff's death – an appalling threat to her personal safety.

67. Defendants Zaied and Oscar Hernandez are the managing members of Cliq Management. As all Defendants were aware, Daniel Hernandez also acted as and held himself out to be a managing member and authorized agent of Cliq Management. However, unbeknownst to Plaintiff, Defendants decided not to document Daniel Hernandez's status as a member and agent so they could use Cliq Management to defraud Plaintiff and hide the proceeds from the IRS.

68. In February 2024, Defendants had Cliq Management open four bank accounts at J.P. Morgan Chase bank in Florida, all in Cliq Management's name. One of those accounts, which ended in x7198, was exclusively for Daniel Hernandez. Another account, which ended in x7206, was supposed to be exclusively for Plaintiff. The other accounts were an operating account (x7222) and an account for Oscar Hernandez and Zaied (x7230).

69. On or about October 23, 2023, Zaied created Cliq Group LLC.

70. In response to Daniel Hernandez's demands, Iris Live transferred Plaintiff's $290,000 to Cliq Group LLC. It did so via three transfers. The first transfer occurred on February 3, 2024, and was for $40,000. The second transfer occurred on February 17, 2024, and was for $200,000. The third transfer occurred on March 1, 2024, and was for $50,000. These transfers each are identifiable via transfer receipts.

71. All three transfers went to Cliq Group LLC's JP Morgan Chase account in Florida ending x1805.

72. Instead of transferring the Distribution Agreement Funds to an account held personally by Plaintiff – or at least to the Cliq Management account designated for Plaintiff (x7206) ("Plaintiff's Cliq Management Account") – and keeping the funds safe and intact, as promised, Zaied had Cliq Group LLC transfer $250,000 of those funds to Daniel Hernandez's Cliq Management account ending x7198. Zaied knowingly and intentionally made or directed the transfers in support of the scheme to defraud Plaintiff. It is unclear how or when Defendants transferred the remaining $40,000 to themselves.

73. From February to April 2024, Defendants transferred some funds into Plaintiff's Cliq Management Account, but quickly proceeded to drain those funds by misappropriating the funds to themselves and for their benefit. As Defendants all were aware, Plaintiff did not authorize Defendants to take control of her funds, keep the funds in an account held by Cliq Management, or spend any of her funds.

74. At Daniel Hernandez's instructions, Oscar Hernandez and Zaied knowingly and intentionally created fake accounting statements to continue defrauding Plaintiff.

75. When Plaintiff asked Daniel Hernandez about the status of her account and why she had not received a check card, Daniel Hernandez lied and told Plaintiff that the bank was having a problem issuing the card and that it would be resolved soon. This was false, as all Defendants were aware. Defendants had a bank card for Plaintiff's Cliq Management Account and frequently used it without Plaintiff's knowledge or authorization. To conceal Defendants' fraud, Daniel Hernandez told Plaintiff not to worry about the delay in obtaining the bank card since she did not need it because he was wealthy and would pay for all her expenses.

76. Defendants never have given Plaintiff any of her money.

77. During the parties' relationship, Daniel Hernandez insisted that he and Plaintiff only stay at luxury hotels and villas, so that he could enjoy them at Plaintiff's expense by using her money to pay for them, while falsely claiming he was footing the bill.

78. On February 7, 2024, four days after Defendants received Plaintiff's $40,000 transfer from Iris Live, Daniel Hernandez invited Plaintiff and her friends to a luxury villa for a party, claiming that he wanted to treat them at his own expense. Indeed, Daniel Hernandez recorded a video for his social media accounts, claiming that he had paid for the gathering himself. Plaintiff would later learn that Defendants had used her money to fund the entire event.

79. On February 17, 2024, the same day Defendants received the $200,000 transfer of Plaintiff's funds, Daniel Hernandez repeated the same fraud. He invited Plaintiff and her friends to a luxury villa, purportedly as a Valentine's Day surprise for Plaintiff's benefit. However, unbeknownst to Plaintiff, this was no "gift," as Defendants used Plaintiff's money to pay for the event.

80. In late-February to early-March 2024, Daniel Hernandez purchased a McLaren luxury sports car, telling Plaintiff that it was a gift for her and that it was fully paid off. A few months later, the vehicle was repossessed due to an unpaid lien. Only when the car was repossessed did Plaintiff learn that the vehicle was not paid off. Moreover, Daniel Hernandez had paid the initial deposit for the car with Plaintiff's money.

81. On March 10, 2024, Daniel Hernandez booked a villa for several days, ostensibly to celebrate Plaintiff's daughter's birthday, and invited Plaintiff's family and friends for a large party. In connection with this party, Daniel Hernandez went so far as to falsely claim on social media that he was paying for the villa and event. However, Defendants used Plaintiff's money to pay for these expenses, without Plaintiff's knowledge or consent.

82. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive

these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff (the "Music Video Funds"). However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

83. Defendants diverted all or a substantial portion of the $190,000 Music Video Funds to their own pockets for their own personal uses. To make matters worse, and despite stealing the money that was supposed to be used for Plaintiff's music videos, Daniel Hernandez is attempting to use the Court to further perpetuate this fraud by alleging falsely in his Counterclaim that he personally paid for Plaintiff's music videos and seeking reimbursement from Plaintiff for such expenses.

84. In addition to funding their personal expenses and escapades, Defendants used Plaintiff's money without her knowledge or authorization to pay for monthly subscriptions to QuickBooks (which was set to auto draft from Plaintiff's Cliq Management Account every month) and Google Workspace.

85. Defendants also transferred funds from Plaintiff's account to pay for Daniel Hernandez's security and a monthly subscription to Netflix, all without Plaintiff's knowledge or authorization.

86. Defendants made direct transfers of cash to themselves via Zelle and wire transfers from Plaintiff's Cliq Management Account, without her knowledge or authorization.

87. Defendants transferred Plaintiff's funds to pay third parties for Defendants' benefit, without Plaintiff's knowledge or authorization.

88. Plaintiff would not have authorized any of Defendants' expenditures of her money or used her money to pay for any such expenditures.

89. Zaied was deeply involved in the aspects of the scheme involving the movement of money, including the transfers to, from, and between the Cliq Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

90. To conceal their scheme, Defendants each lied to Cliq Management's in-house accountant, falsely telling her that Plaintiff had approved the withdrawals from her account.

91. Defendants owed Plaintiff fiduciary duties, including a heightened duty of care, loyalty, and honesty, because they gained Plaintiff's trust, told her that they would help her open her personal bank account, and took control of her funds. They also owed Plaintiff fiduciary duties by purporting to act as her agent, manager, and/or representative.

92. The Cliq Agreement merely was an instrument Defendants used to effect their fraudulent scheme. For example, Defendants each lied to Cliq Management's in-house accountant, falsely telling her that transfers from Plaintiff's account were for expenses covered by the Cliq Agreement.

93. Daniel Hernandez frequently combined Defendants' embezzlement and fraud with further instances of physical and emotional abuse. For instance, at the March 10, 2024 party described above, a third party witnessed Daniel Hernandez putting an unknown white powdery substance in Plaintiff's drink. Indeed, more than one person subsequently has told Plaintiff that they observed Daniel Hernandez surreptitiously drug Plaintiff on multiple occasions. Daniel Hernandez even admitted to others that the white powdery substance would calm Plaintiff down and make her do what he wants her to do.

94. Daniel Hernandez would take advantage of the drugged induced states he put Plaintiff in and sexually assault her. Specifically, Daniel Hernandez would have sex with Plaintiff while she was unable to give or deny consent to his sexual contact due to being surreptitiously drugged by Daniel Hernandez or because she was unconscious or otherwise incapacitated.

95. On or about March 31, 2024, Daniel Hernandez forced Plaintiff to undergo plastic surgery to improve her appearance after having repeatedly told her that she was not pretty enough. Daniel Hernandez forced Plaintiff to travel to Colombia to undergo cosmetic procedures, including extensive liposuction surgery. During this same trip, Daniel Hernandez's security guard "Ronaldo" was also gifted

with veneers for his teeth, which Defendants paid for with Plaintiff's money without her consent or knowledge.

96. On May 17, 2024, Daniel Hernandez argued to Plaintiff that the appearance of her breasts needed work and demanded that she undergo plastic surgery to better conform their appearance to his liking. Coerced by Daniel Hernandez, Plaintiff underwent breast augmentation surgery, later to discover that Defendants had used her money to pay for this procedure as well – without her knowledge and consent.

97. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and some of Daniel Hernandez's friends and relatives to a villa for another party. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, purses, Rolex watch, chain, and other jewelry and valuables worth at least $160,000. Adding insult to injury, Defendants had once again used Plaintiff's funds, without her knowledge and consent, to pay for the trip during which some of her most prized possessions were stolen.

98. In each of the foregoing instances, and others not detailed here, Plaintiff believed that Daniel Hernandez was spending his money for her benefit, as he repeatedly and publicly asserted. Plaintiff never authorized or consented to Defendants' use of <u>her</u> money for these lavish and unnecessary expenditures. Nor would she have authorized or consented to these expenditures. Plaintiff remained ignorant of the truth, relying on Daniel Hernandez's persistent and false assurances

that he was funding all of these events and expenses, which Plaintiff had no opportunity to disprove, particularly given Defendants' broader pattern of control, abuse, and concealment.

99. At no time prior to August 2024, was Plaintiff aware that Defendants had been stealing from her on a vast scale, and that Defendants had used her money – without her consent and against her will – to pay for the expenditures described above.

100. After Plaintiff filed the Complaint, Zaied (and possibly Oscar Hernandez) began purging and destroying Cliq Management's email accounts and documents in an attempt to conceal and perpetuate their fraud.

## IV. Daniel Hernandez Publishes X-Rated Videos of Plaintiff Without Her Knowledge or Consent

101. After learning the scope and magnitude of Daniel Hernandez's fraud and deceit, Plaintiff found the courage and fortitude to end her relationship with Daniel Hernandez.

102. In retaliation for ending the relationship, Daniel Hernandez (possibly with assistance from one or more of the other Defendants) intentionally and purposefully published intimate and private and sexually explicit videos of Plaintiff – which were taken without her knowledge or consent – on social media.

103. On August 19, 2024, Plaintiff's X account, and that of her manager, received direct messages from an unknown account under the username @nukkikiiiiiijay1dufo, sending a photograph that showed Plaintiff and Daniel

Hernandez (both identifiable in the image) engaged in sexual contact. The messages threatened that the full video would be released shortly.

104. Neither Plaintiff nor her manager viewed the extortionate message at the time, as it went unnoticed in the large volume of messages they receive.

105. On or about August 19, 2024, the anonymous X/Twitter account under the username @nukkikiiiiiiijay1dufo shared a video of Plaintiff, Daniel Hernandez, and two other women engaging in private and intimate sexual acts, a video taken without Plaintiff's knowledge and consent. Similarly, on August 21, 2024, an anonymous X/Twitter account under the username @2good2betr8656 further shared the video footage of Plaintiff and Daniel Hernandez, along with other individuals, engaged in sex acts.

106. Daniel Hernandez was the only person in possession of this recording taken without Plaintiff's consent, and his long history of abuse and control of Plaintiff, along with his exclusive possession of the video, proves that he is responsible for the video's publication.

107. Plaintiff did not consent to the recording, publication, or disclosure of the explicit videos in question.

108. Absent injunctive relief, Daniel Hernandez would remain able to re-publish "revenge porn" of Plaintiff, through X/Twitter or other accounts and platforms, whenever he chooses.

109. Moreover, Daniel Hernandez has amply demonstrated his intent to continue exploiting, harassing, and attacking Plaintiff and using her image and likeness – and that of Jane Doe – for his own commercial benefit.

110. Plaintiff uses his social media accounts for commercial purposes. He earns money based on the number of users who click on his videos and other posts. In addition, he uses his social media accounts to promote sales of his music and streams via apps like Apple Music and to promote his brand (which he uses among other things to earn income from endorsements).

111. On or about September 4, 2024, Daniel Hernandez posted a music video for his new song, "La Respuesta" (the "Respuesta Video"). The music video incorporates professional and home videos of Plaintiff and Jane Doe (the images of Jane Doe's face are blurred), including in private moments. The images are juxtaposed against the lyrics of the song, wherein Daniel Hernandez addresses Jane Doe directly and says: "I hope she never be bad like her mother." Plaintiff's and Jane Doe's images and likeness are readily identifiable in the Respuesta Video. Daniel Hernandez used Plaintiff's and Jane Doe's images and likeness with the intent of promoting himself, his brand, the video, the song, and its sales for commercial purposes, as well as to earn money via "clicks" and "likes." Plaintiff did not and does not authorize Defendant to publish Plaintiff's image or likeness or that of Jane Doe, including as they appear on the Respuesta Video, on social media or elsewhere. As of the filing of the Second Amended Complaint, the video has received more than 33 million views on YouTube.

112. On September 21, 2024, Defendant posted a video of Jane Doe on Instagram Live. Daniel Hernandez's Instagram account has approximately 25.7 million followers as of the date of this Second Amended Complaint. The video depicts Defendant turning his phone to reveal unblurred pictures and videos of Jane Doe. In the video, Jane Doe only is wearing diapers and, among other things, is depicted lying in bed in Defendant's arms. Daniel Hernandez used Plaintiff's and Jane Doe's images and likeness in the video with the intent of promoting himself, his brand, his social media account, his songs, and their streams and sales for commercial purposes. Plaintiff did not and does not authorize Defendant to publish Plaintiff's image or likeness or that of Jane Doe, including as they appear in the video, on social media or elsewhere.

113. As recently as September 18, 2024, the account @2good2betrue69's posted content incorporating video footage of Plaintiff and Daniel Hernandez engaged in sex acts was once again live on X/Twitter, demonstrating the need for permanent relief against Daniel Hernandez. Daniel Hernandez and his affiliates continued to harass Plaintiff by frequently calling and texting her.

114. All conditions precedent to the filing of this action have been satisfied or waived.

**FIRST CAUSE OF ACTION**
**Nonconsensual Pornography in Violation of 15 U.S.C. § 6851 Against Daniel Hernandez**

115. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

116. In August 2024, Daniel Hernandez published a sexually explicit video of Plaintiff on the internet, by posting it on the X/Twitter account @nukkikiiiiiijay1dufo.

117. The video in question shows Plaintiff and Daniel Hernandez nude and engaging in sex acts, including oral sex.

118. Both Plaintiff and Daniel Hernandez are identifiable in the video, due to, among other things, depiction of their faces or distinguishing characteristics such as tattoos.

119. Plaintiff never consented to Daniel Hernandez's taking of or publication of the video.

120. Daniel Hernandez was and is aware that Plaintiff has never consented to taking of or publication of the video, or in the alternative, recklessly disregarded whether Plaintiff had consented to its taking or publication.

121. As a result of Daniel Hernandez's misconduct, Plaintiff has been injured in an amount to be proven, including reputational damages and emotional injuries.

122. Daniel Hernandez has other sexually explicit images and videos of Plaintiff in his possession and control. Plaintiff did not and does not authorize the publication of any such images or videos.

123. Plaintiff is entitled to recover her actual damages sustained as a result of Daniel Hernandez's misconduct in an amount to be proven, or liquidated damages in the amount of $150,000, whichever is greater, punitive or exemplary damages, and an award of Plaintiff's reasonable attorneys' fees and costs, and a permanent

injunction barring Daniel Hernandez from any future use or publication of intimate visual depictions of her.

**SECOND CAUSE OF ACTION**
**Battery/Sexual Battery Against Daniel Hernandez**

124. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

125. Daniel Hernandez has repeatedly physically attacked Plaintiff, in instances of violent domestic abuse throughout their relationship, including the following particular examples.

126. At Jane Doe's baptism, Daniel Hernandez struck Plaintiff and threatened to throw her off a balcony.

127. In June 2023, Daniel Hernandez struck Plaintiff in the face while the two were staying together at a hotel in New York City.

128. In November 2023, Daniel Hernandez attacked Plaintiff during a private jet flight from New York to Miami.

129. In December 2023, Daniel Hernandez shoved and struck Plaintiff at a Miami nightclub.

130. On May 8, 2024, Daniel Hernandez punched Plaintiff in the face, inflicting a black eye.

131. In each of these instances, Daniel Hernandez's blows constituted a harmful and offensive contact upon Plaintiff.

132. In each of these instances, Daniel Hernandez acted intentionally and deliberately in punching and physically harming Plaintiff.

133. Further, Daniel Hernandez repeatedly drugged Plaintiff without her knowledge and would coerce her to take drugs. He did so with the intent of forcing Plaintiff to engage in non-consensual sexual acts with him.

134. Daniel Hernandez would have non-consensual sex with Plaintiff while she was in this involuntarily impaired condition or unconscious.

135. Daniel Hernandez's sexual contact on Plaintiff while she was in a forced drugged state or unconscious and not able to consent constitute a harmful and offensive contact upon Plaintiff.

136. Daniel Hernandez acted intentionally and deliberately in all sexual contact with Plaintiff while she was unable to consent due to being drugged or unconscious.

137. As a result of Daniel Hernandez's violent actions, Plaintiff has suffered injuries including, but not limited to, bodily injury, pain and suffering, disfigurement, mental anguish, costs of medical treatment, and loss of earnings.

138. Consequently, Plaintiff is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
**Assault Against Daniel Hernandez**

139. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

140. Daniel Hernandez has repeatedly threatened to use force to cause bodily injury to Plaintiff through threats of physical and sexual abuse.

141. For example, while at Daniel Hernandez's property in Palm Beach County, Daniel Hernandez saw Plaintiff in the driveway and intentionally accelerated his car quickly in her direction.

142. Daniel Hernandez's quick acceleration and proximity to Plaintiff created a reasonable fear that he would hit her with the car.

143. On August 23, 2023 at the baptism of Jane Doe, Daniel Hernandez threatened to throw Plaintiff from a balcony after punching her.

144. Daniel Hernandez made intentional, unlawful threats of harmful and offensive physical contact to Plaintiff.

145. At all times that Daniel Hernandez threatened to physically harm Plaintiff, he had the apparent and present ability to do so.

146. Daniel Hernandez's history of physically assaulting Plaintiff created a reasonable fear of imminent peril.

147. Consequently, Plaintiff is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**Against Daniel Hernandez**

148. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

149. Daniel Hernandez committed outrageous and atrocious conduct towards Plaintiff, through a pervasive, months-long campaign of violent physical abuse and extreme emotional abuse.

150. Daniel Hernandez's abusive actions toward Plaintiff, include, but are not limited to, violently assaulting Plaintiff on multiple occasions; gaslighting her to convince her that this violent abuse was in fact her fault; releasing pornographic sexual content of Plaintiff to humiliate and threaten her, including in front of the whole world and Plaintiff's family; degrading and controlling Plaintiff's physical appearance to the point of coercing her to undergo unnecessary cosmetic surgery; drugging Plaintiff; consciously working to alienate Plaintiff from her friends and relatives, so as to increase her dependence on Daniel Hernandez; and belittling and humiliating Plaintiff during the course of the parties' relationship via constant verbal abuse.

151. Daniel Hernandez's actions as described herein constitute textbook domestic abuse, a pattern of conduct utterly intolerable in a civilized community. The acts are so outrageous in character, and so extreme in degree, as to violate all possible bounds of decency.

152. Daniel Hernandez acted intentionally or recklessly at all times, intentionally acting abusively toward Plaintiff when he knew, or reasonably should have known, that Plaintiff would suffer extreme emotional distress as a result.

153. Daniel Hernandez knew that Plaintiff was especially susceptible to severe emotional distress as a result of his abuse for multiple reasons, including, but not limited to, that Plaintiff was his romantic partner, and therefore likely to be especially traumatized by such abuse from a figure who would ordinarily be a source of love and support; that Plaintiff lacked other sources of support as a direct result of

Daniel Hernandez's own actions in isolating Plaintiff from her friends and family; and that the power balance in Daniel Hernandez and Plaintiff's relationship was profoundly skewed in his favor, due to Daniel Hernandez's significant wealth and prominence, his ability to physically intimidate and dominate Plaintiff through acts of force by himself or his associates, and Daniel Hernandez's success in isolating Plaintiff from others who might have defended her.

154. Plaintiff has suffered severe emotional distress as the direct result of Daniel Hernandez's abusive and barbaric actions toward her. Plaintiff's severe emotional distress has manifested in, among other things, trauma, mental suffering and anguish, lost enjoyment or quality of life, depression, and anxiety.

155. As a result of Daniel Hernandez's knowing infliction of severe emotional distress upon Plaintiff through a deliberate course of violent, manipulative abuse, Plaintiff is entitled to recover compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**Unauthorized Publication in Violation of Fla. Stat. § 540.08**
**Against Daniel Hernandez**

156. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

157. Daniel Hernandez has intentionally and purposefully used photographs of Plaintiff and Jane Doe in his music video entitled "La Respuesta" for commercial purposes, including, but not limited to, the promoting and advertising of the music video.

158. Daniel Hernandez has intentionally and purposefully used the images and likeness of Plaintiff and Jane Doe on his Instagram account for his own commercial benefit, including but not limited to, garnering publicity, and more views and streams on his social media, which provide Daniel Hernandez with sources of income that go beyond the sale of his song.

159. Plaintiff's image, likeness and/or identity are recognizable in Daniel Hernandez's music video and social media post.

160. Jane Doe's image, likeness, and/or identity are recognizable in Daniel Hernandez's music video and social media post.

161. Daniel Hernandez did not obtain the express written or oral consent of Plaintiff to use these photographs in his music video.

162. Plaintiff did not authorize, consent, license, or otherwise agree to Daniel Hernandez's use of her or Jane Doe's photograph, likeness, and/or identity in Daniel Hernandez's music video or in his Instagram post.

163. Daniel Hernandez's unauthorized use of the photographs, likeness, and/or identity is causing irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law to prevent Daniel Hernandez's continued unauthorized use of her and Jane Doe's photographs, likeness, and/or identity in Daniel Hernandez's commercial purposes.

164. Plaintiff is entitled to the remedies provided in Fla. Stat § 540.08(2), including, but not limited to, damages for any loss or injury sustained, including an

amount which would have been a reasonable royalty, and punitive or exemplary damages.

**SIXTH CAUSE OF ACTION**
**Invasion of Privacy – Misappropriation**
**Against Daniel Hernandez**

165. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

166. Daniel Hernandez has intentionally and purposefully used photographs of Plaintiff and Jane Doe in his music video entitled "La Respuesta" for commercial purposes, including, but not limited to, the promoting and advertising of the music video.

167. Daniel Hernandez has intentionally and purposefully used the images and likeness of Plaintiff and Jane Doe on his Instagram account for his own commercial benefit, including but not limited to, garnering publicity, and more views and streams on his social media, which provide Daniel Hernandez with sources of income that go beyond the sale of his song.

168. Plaintiff's image, likeness and/or identity are recognizable in Daniel Hernandez's music video and social media post.

169. Jane Doe's image, likeness, and/or identity are recognizable in Daniel Hernandez's music video and social media post.

170. Daniel Hernandez did not obtain the express written or oral consent of Plaintiff use these photographs in his music video.

171. Plaintiff did not authorize, consent, license, or otherwise agree to Daniel Hernandez's use of her or Jane Doe's photograph, likeness, and/or identity in Daniel Hernandez's music video or in his Instagram post.

172. Daniel Hernandez's unauthorized use of the photographs, likeness, and/or identity is causing irreparable harm to Plaintiff. Plaintiff has no adequate remedy at law to prevent Daniel Hernandez's continued unauthorized use of her and Jane Doe's photographs, likeness, and/or identity in Daniel Hernandez's commercial purposes.

173. Plaintiff is entitled to all remedies available under the common law tort of invasion of privacy, including but not limited to, compensatory damages and punitive or exemplary damages sustained for the misappropriation of her and Jane Doe's child's image, likeness, and/or identity.

## SEVENTH CAUSE OF ACTION
## False Imprisonment Against Daniel Hernandez

174. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

175. On December 14, 2023, Daniel Hernandez and his security team confined Plaintiff on Daniel Hernandez's property in Palm Beach County. Upon Plaintiff's wishes to return to the Dominican Republic, Daniel Hernandez confiscated Plaintiff's passport and money.

176. Despite her wishes to leave, Plaintiff was unable to leave Daniel Hernandez's house because his gated community required authorization for entrance

and exit. Daniel Hernandez refused to grant such authorization to permit Plaintiff to leave.

177. Daniel Hernandez and his security team had no authority to confiscate Plaintiff's passport or confine her to the premises.

178. Daniel Hernandez's confinement of Plaintiff was unreasonable and unwarranted under the circumstances. Daniel Hernandez's confinement of Plaintiff was merely an exertion of further emotional abuse and power over Plaintiff.

179. As a result of Daniel Hernandez's false imprisonment of Plaintiff, Plaintiff has been damaged and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**Conversion of Distribution Agreement Funds**
**Against All Defendants**

180. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

181. Defendants asserted wrongful dominion over the Distribution Agreement Funds.

182. The Distribution Agreement Funds were and are Plaintiff's property.

183. The Distribution Agreement Funds were separate and identifiable.

184. Defendants undertook and had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name and in her sole control. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

185. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

186. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the conversion.

187. Plaintiff has demanded that Defendants return her funds, but they have not done so.

188. These funds amount to $290,000, which Plaintiff is entitled to.

189. As a result of Defendants' acts, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**Conspiracy to Commit Conversion of Distribution Agreement Funds**
**Against All Defendants**

190. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

191. Defendants knowingly entered into a conspiracy, the object of which was to deprive Plaintiff of the Distribution Agreement Funds.

192. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

193. Defendants asserted wrongful dominion and control over the Distribution Agreement Funds.

194. The Distribution Agreement Funds were and are Plaintiff's property.

195. The Distribution Agreement Funds were separate and identifiable.

196. Defendants undertook and had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

197. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel

Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

198. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the conversion.

199. Plaintiff has demanded that Defendants return her funds, but they have not done so.

200. These funds amount to $290,000, which Plaintiff is entitled to.

201. As a direct and proximate result of Defendants' conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
**Aiding and Abetting Conversion of Distribution Agreement Funds**
**Against All Defendants**

202. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

203. Defendants, through the wrongful conduct alleged above, misappropriated and converted the Distribution Agreement Funds belonging to Plaintiff.

204. Defendants had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

205. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel

Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

206. These funds amount to $290,000, which Plaintiff is entitled to.

207. Each of the Defendants had actual knowledge of their co-Defendant's misappropriation and conversion of the Distribution Agreement Funds, including through their collaboration with each other in running the sham corporation, Cliq Management.

208. Without the substantial assistance of their co-Defendants, none of the Defendants would have been able to successfully convert the Distribution Agreement Funds; the Defendants ran a sophisticated operation to manipulate and defraud Plaintiff, and their cooperation with each other was essential to the ruse being successful.

209. As a result of the Defendants' conversion and their co-Defendants' assistance thereof, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**Conversion of Music Video Funds**
**Against All Defendants**

210. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

211. Defendants asserted wrongful dominion over the Music Video Funds.

212. The Music Video Funds were and are Plaintiff's property.

213. The Music Video Funds were separate and identifiable.

214. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name and subject to her exclusive control. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

215. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the

signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

216. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the conversion.

217. Plaintiff has demanded that Defendants return her funds, but they have not done so.

218. Plaintiff was entitled to the $190,000 Music Video Funds.

219. As a result of Defendants' acts, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWELFTH CAUSE OF ACTION**
**Conspiracy to Commit Conversion of the Music Video Funds**
**Against All Defendants**

220. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

221. Defendants knowingly entered into a conspiracy, the object of which was to deprive Plaintiff of the Music Video Funds.

222. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

223. Defendants asserted wrongful dominion over the Music Video Funds.

224. The Music Video Funds were and are Plaintiff's property.

225. The Music Video Funds were separate and identifiable.

226. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

227. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; lying to Equity Distribution and other parties by claiming to act with Plaintiff's knowledge and consent and as her agents or managers; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and

in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

228. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the conversion.

229. Plaintiff has demanded that Defendants return her funds, but they have not done so.

230. These funds amount to $190,000, which Plaintiff is entitled to.

231. As a direct and proximate result of Defendants' conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation

and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**THIRTEENTH CAUSE OF ACTION**
**Aiding and Abetting Conversion of the Music Video Funds**
**Against All Defendants**

232. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

233. Defendants, through the wrongful conduct alleged above, misappropriated and converted the Music Video Funds belonging to Plaintiff.

234. Defendants asserted wrongful dominion over the Music Video Funds.

235. The Music Video Funds were and are Plaintiff's property.

236. The Music Video Funds were separate and identifiable.

237. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

238. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; lying to Equity Distribution and other parties by claiming to act with Plaintiff's knowledge and consent and as her agents or managers; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity

Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

239. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the conversion.

240. These funds amount to $190,000, which Plaintiff is entitled to.

241. Each of the Defendants had actual knowledge of their co-Defendant's misappropriation and conversion of the Music Video Funds, through their collaboration with each other in running the sham corporation, Cliq Management, LLC.

242. Without the substantial assistance of their co-Defendants, none of the Defendants would have been able to successfully convert the Music Video Funds; the Defendants ran a sophisticated operation to manipulate and defraud Plaintiff, and their cooperation amongst each other was essential to the ruse being successful.

243. As a result of the Defendants' conversion and their co-Defendants' assistance thereof, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**FOURTEENTH CAUSE OF ACTION**
**Conversion of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

244. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

245. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

246. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

247. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

248. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

249. The valuables were and are Plaintiff's property.

250. Plaintiff has demanded that Daniel and Oscar Hernandez return her property, but they have not done so.

251. As a result of Daniel and Oscar Hernandez' acts, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**FIFTEENTH CAUSE OF ACTION**
**Conspiracy to Commit Conversion of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

252. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

253. Defendants Daniel and Oscar Hernandez knowingly entered into a conspiracy, the object of which was to convert Plaintiff's valuables. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

254. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

255. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

256. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

257. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

258. The valuables were and are Plaintiff's property.

259. Plaintiff has demanded that Daniel and Oscar Hernandez return her valuables, but they have not done so.

260. As a direct and proximate result of Daniel and Oscar Hernandez's conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**SIXTEENTH CAUSE OF ACTION**
**Aiding and Abetting Conversion of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

261. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

262. Daniel and Oscar Hernandez, through the wrongful conduct described above, misappropriated and converted the valuables belonging to Plaintiff.

263. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

264. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

265. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

266. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

267. The valuables were and are Plaintiff's property.

268. Plaintiff has demanded that Daniel and Oscar Hernandez return her valuables, but they have not done so.

269. Both Daniel and Oscar Hernandez had actual knowledge of the other's misappropriation and conversion of the valuables. They worked in tandem to deprive the Plaintiff of the valuables and ensure she did not have it returned to her.

270. Without the substantial assistance of the other, they would not have been able to successfully convert the valuables. Seizing the jewelry and keeping it away from Plaintiff was a team effort engaged in by both Daniel Hernandez and Oscar Hernandez.

271. As a result of Daniel and Oscar Hernandez's conversion and each of their assistance of the other's acts, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

## <u>SEVENTEENTH CAUSE OF ACTION</u>
## Civil Theft of Distribution Agreement Funds
## Against All Defendants

272. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

273. Defendants asserted wrongful dominion over the Distribution Agreement Funds.

274. The Distribution Agreement Funds were and are Plaintiff's property.

275. The Distribution Agreement Funds were separate and identifiable.

276. Defendants undertook and had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

277. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement

Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

278. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the civil theft.

279. Plaintiff has demanded that Defendants return her funds, but they have not done so.

280. These funds amount to $290,000, which Plaintiff is entitled to.

281. As a result of Defendants' acts, Plaintiff has suffered and continues to suffer from the deprivation of her property.

282. Defendants' actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Defendants' violation of Fla. Stat. § 812.014 (Theft).

283. Plaintiff is entitled to relief as provided for in Fla. Stat. § 772.11, including but not limited to, actual, treble, and punitive or exemplary damages.

## EIGHTEENTH CAUSE OF ACTION
## Conspiracy to Commit Civil Theft of Distribution Agreement Funds Against All Defendants

284. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

285. Defendants knowingly entered into a conspiracy, the object of which was to deprive Plaintiff of the Distribution Agreement Funds.

286. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

287. Defendants asserted wrongful dominion and control over the Distribution Agreement Funds.

288. The Distribution Agreement Funds were and are Plaintiff's property.

289. The Distribution Agreement Funds were separate and identifiable.

290. Defendants undertook and had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

291. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel

Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

292. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the civil theft.

293. Plaintiff has demanded that Defendants return her funds, but they have not done so.

294. These funds amount to $290,000, which Plaintiff is entitled to.

295. Defendants' actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Defendants' violation of Fla. Stat. § 812.014 (Theft).

296. As a direct and proximate result of Defendants' conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**NINETEENTH CAUSE OF ACTION**
**Aiding and Abetting Civil Theft of Distribution Agreement Funds**
**Against All Defendants**

297. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

298. Defendants, through the wrongful conduct alleged above, misappropriated and committed civil theft of the Distribution Agreement Funds belonging to Plaintiff.

299. Defendants had an obligation to keep the Distribution Agreement Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

300. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's

ownership rights, by: lying to Plaintiff; falsely telling Plaintiff that Equity Distribution and Ivy Live were stealing from her; convincing Plaintiff that Daniel Hernandez would use his celebrity to save the Distribution Agreement Funds from Ivy Live, when in fact, Defendants merely were trying to get possession of the Distribution Agreement Funds and use them for themselves; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control and that they would have the Distribution Agreement Funds transferred to that account; directing the transfer of the Distribution Agreement Funds to Cliq Management Accounts; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Distribution Agreement Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

301. These funds amount to $290,000, which Plaintiff is entitled to.

302. Defendants' actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Defendants' violation of Fla. Stat. § 812.014 (Theft).

303. Each of the Defendants had actual knowledge of their co-Defendant's misappropriation and civil theft of the Distribution Agreement Funds, including through their collaboration with each other in running the sham corporation, Cliq Management.

304. Without the substantial assistance of their co-Defendants, none of the Defendants would have been able to successfully commit civil theft of the Distribution Agreement Funds; the Defendants ran a sophisticated operation to manipulate and defraud Plaintiff, and their cooperation with each other was essential to the ruse being successful.

305. As a result of the Defendants' civil theft and their co-Defendants' assistance thereof, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTIETH CAUSE OF ACTION**
**Civil Theft of Music Video Funds**
**Against All Defendants**

306. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

307. Defendants asserted wrongful dominion over the Music Video Funds.

308. The Music Video Funds were and are Plaintiff's property.

309. The Music Video Funds were separate and identifiable.

310. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

311. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent

to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

312. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the civil theft.

313. Plaintiff has demanded that Defendants return her funds, but they have not done so.

314. Plaintiff was entitled to the $190,000 Music Video Funds.

315. As a result of Defendants' acts, Plaintiff has suffered and continues to suffer from the deprivation of her property.

316. Daniel Hernandez's actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Daniel Hernandez's violation of Fla. Stat. § 812.014 (Theft).

317. Plaintiff is entitled to relief as provided for in Fla. Stat. § 772.11, including but not limited to, actual, treble, and punitive or exemplary damages.

## TWENTY-FIRST CAUSE OF ACTION
## Conspiracy to Commit Civil Theft of Music Video Funds
## Against All Defendants

318. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

319. Defendants knowingly entered into a conspiracy, the object of which was to deprive Plaintiff of the Music Video Funds.

320. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

321. Defendants asserted wrongful dominion over the Music Video Funds.

322. The Music Video Funds were and are Plaintiff's property.

323. The Music Video Funds were separate and identifiable.

324. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

325. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; lying to Equity Distribution and other parties by claiming to act with Plaintiff's knowledge and consent and as her agents or managers; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and

in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

326. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the civil theft.

327. Plaintiff has demanded that Defendants return her funds, but they have not done so.

328. These funds amount to $190,000, which Plaintiff is entitled to.

329. Defendants' actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Defendants' violation of Fla. Stat. § 812.014 (Theft).

330. As a direct and proximate result of Defendants' conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTY-SECOND CAUSE OF ACTION**
**Aiding and Abetting Civil Theft of Music Video Funds**
**Against All Defendants**

331. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

332. Defendants, through the wrongful conduct alleged above, misappropriated and committed civil theft of the Music Video Funds belonging to Plaintiff.

333. Defendants asserted wrongful dominion over the Music Video Funds.

334. The Music Video Funds were and are Plaintiff's property.

335. The Music Video Funds were separate and identifiable.

336. Defendants had an obligation to keep the Music Video Funds separate, intact, and identifiable, in a segregated account held only in Plaintiff's name. Defendants all were aware of the other Defendants' misconduct and were obligated to disclose such misconduct to Plaintiff.

337. Defendants knowingly and intentionally obtained and exercised wrongful dominion over these funds, and acted inconsistent with Plaintiff's ownership rights, by: contacting Equity Distribution to obtain the Music Video Funds without Plaintiff's knowledge or consent; lying to Equity Distribution and other

parties by claiming to act with Plaintiff's knowledge and consent and as her agents or managers; purporting to act as Plaintiff's agents or managers and under color of her authority despite knowing that they had no such authority; directing Equity Distribution to transfer the Music Video Funds to them and not transferring such funds to an account held exclusively by Plaintiff; falsely telling Plaintiff that Daniel Hernandez was paying for the production of her music videos; falsely telling Plaintiff that they would open and had opened a bank account for her, in her name only and in her sole control; directing the transfer of the Music Video Funds to Cliq Management Accounts and other accounts outside of Plaintiff's control without her knowledge or consent; directing others to lie to Plaintiff on their behalf; creating false account statements; lying to Cliq Management's in-house accountant to effect unauthorized fund transfers; misrepresenting to Plaintiff that the signature page of the Cliq Agreement was a bank signature card; presenting the signature page of the Cliq Agreement to Plaintiff while she was incapacitated; creating Cliq Management for the purpose of defrauding Plaintiff; transferring and spending Plaintiff's funds knowing that she did not authorize, know about, or consent to such transfers or expenditures; lying to Plaintiff by telling her that Daniel Hernandez was paying for expenses when, in fact, Defendants knowingly and wrongfully were using Plaintiff's funds to pay for the expenses; misappropriating the Music Video Funds for their own benefit without Plaintiff's knowledge or consent; and concealing their false statements from Plaintiff and others.

338. Defendants knowingly and intentionally exploited Plaintiff's weakened state and vulnerability, including as created by Daniel Hernandez's conduct, to commit the civil theft.

339. These funds amount to $190,000, which Plaintiff is entitled to.

340. Defendants' actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Defendants' violation of Fla. Stat. § 812.014 (Theft).

341. Each of the Defendants had actual knowledge of their co-Defendant's misappropriation and civil theft of the Music Video Funds, through their collaboration with each other in running the sham corporation, Cliq Management, LLC.

342. Without the substantial assistance of their co-Defendants, none of the Defendants would have been able to successfully commit civil theft of the Music Video Funds; the Defendants ran a sophisticated operation to manipulate and defraud Plaintiff, and their cooperation amongst each other was essential to the ruse being successful.

343. As a result of the Defendants' civil theft and their co-Defendants' assistance thereof, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTY-THIRD CAUSE OF ACTION**
**Civil Theft of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

344. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

345. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

346. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

347. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

348. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

349. The valuables were and are Plaintiff's property.

350. Plaintiff has demanded that Daniel and Oscar Hernandez return her property, but they have not done so.

351. Daniel and Oscar Hernandez's actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Daniel and Oscar Hernandez's violation of Fla. Stat. § 812.014 (Theft).

352. Plaintiff is entitled to relief as provided for in Fla. Stat. § 772.11, including but not limited to, actual, treble, and punitive or exemplary damages.

**TWENTY-FOURTH CAUSE OF ACTION**
**Conspiracy to Commit Civil Theft of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

353. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

354. Defendants Daniel Oscar Hernandez knowingly entered into a conspiracy, the object of which was to commit civil theft of Plaintiff's valuables. Each of the Defendants committed one or more overt acts and/or omissions in furtherance of the conspiracy.

355. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

356. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

357. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

358. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

359. The valuables were and are Plaintiff's property.

360. Plaintiff has demanded that Daniel and Oscar Hernandez return her valuables, but they have not done so.

361. Daniel and Oscar Hernandez's actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Daniel and Oscar Hernandez's violation of Fla. Stat. § 812.014 (Theft).

362. As a direct and proximate result of Daniel and Oscar Hernandez's conduct in furtherance of the conspiracy, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTY-FIFTH CAUSE OF ACTION**
**Aiding and Abetting Conversion of Valuables**
**Against Daniel Hernandez and Oscar Hernandez**

363. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

364. Daniel Hernandez and Oscar Hernandez, through the wrongful conduct described above, misappropriated and committed civil theft of the valuables belonging to Plaintiff.

365. On June 6, 2024, Daniel Hernandez traveled with Plaintiff and a number of Daniel Hernandez's friends and relatives to a villa for another party.

366. Daniel Hernandez claimed that he was paying for all Plaintiff's expenses, including the villa.

367. During this trip, Daniel and Oscar Hernandez stole Plaintiff's clothes, handbags, Rolex watch, chain, and other jewelry and valuables worth at least $160,000.

368. Daniel and Oscar Hernandez asserted wrongful dominion over Plaintiff's valuables.

369. The valuables were and are Plaintiff's property.

370. Plaintiff has demanded that Daniel and Oscar Hernandez return her valuables, but they have not done so.

371. Daniel and Oscar Hernandez's actions constitute civil theft pursuant to Fla. Stat §772.11 by virtue of Daniel and Oscar Hernandez's violation of Fla. Stat. § 812.014 (Theft).

372. Both Daniel and Oscar Hernandez had actual knowledge of the other's misappropriation and civil theft of the valuables. They worked in tandem to deprive the Plaintiff of the valuables and ensure she did not have it returned to her.

373. Without the substantial assistance of the other, they would not have been able to successfully commit civil theft of the valuables. Seizing the jewelry and keeping it away from Plaintiff was a team effort engaged in by both Daniel and Oscar Hernandez.

374. As a result of Daniel and Oscar Hernandez's civil theft and each of their assistance of the other's acts, Plaintiff has suffered and continues to suffer from the deprivation and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**<u>TWENTY-SIXTH CAUSE OF ACTION</u>**
**Fraud Against All Defendants**

375. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

376. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct. Plaintiff reasonably relied on those statements and omissions to her detriment.

377. Defendants engaged in a fraudulent scheme to wrongfully deprive Plaintiff of her money, including the Distribution Agreement Funds and the Music Video Funds.

378. Knowing that Plaintiff did not have a bank account, Daniel Hernandez told Plaintiff that he would help her by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control.

379. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez' brother, would help her and would not take acts to defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

380. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

381. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over

Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

382. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

383. Defendants used the Cliq Agreement to perpetuate their fraud. Daniel and Oscar Hernandez drugged Plaintiff to get her to sign the signature page of the Cliq Agreement; knowingly and intentionally lied to Plaintiff by telling her it was a document she needed to sign so that they could open a bank account for her; concealed the actual terms of the Cliq Agreement from Plaintiff (to the extent such terms actually existed), including by failing to give her anything but the signature page; and then (along with Zaied) used the Cliq Agreement to convince Cliq Management's in-house accountant that the transfers Defendants were ordering from Plaintiff's Cliq Management account were legitimate.

384. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had the Distribution Agreement Funds transferred to an account held by Cliq Management. That account was in Defendants' control, not Plaintiff's.

385. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff. However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

386. Defendants diverted the $190,000 Music Video Funds to their own pockets for their own personal uses.

387. Daniel Hernandez knowingly and intentionally lied to Plaintiff on numerous occasions by telling her that he was using or would use his own funds to pay for certain expenditures, when in fact Defendants were using or would use Plaintiff's funds without Plaintiff's authorization. All Defendants were aware of these lies and helped conceal them from Plaintiff.

388. To induce Plaintiff to continue letting them hold her funds, spend her money, and perpetuate their fraud, Defendants (including Daniel Hernandez, Oscar

Hernandez, and Zaied) fabricated Cliq Management account statements and lied to Cliq Management's in-house accountant.

389. Zaied was deeply involved in the aspects of the scheme involving the movement of money, including the transfers to, from, and between the Cliq Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

390. Having taken control of Plaintiff's funds, each Defendant had a duty to disclose the other Defendants' wrongful conduct to Plaintiff. Instead, each Defendant worked to perpetuate their fraudulent scheme and benefit from it.

391. Defendants knew that all these false statements and omissions were material and they intended for Plaintiff to rely on them.

392. Plaintiff reasonably relied on Defendants' false statements and omissions.

393. Moreover, after Plaintiff filed her Complaint, Zaied and possibly Oscar Hernandez deleted emails and destroyed documents with the intent of perpetuating and concealing their fraudulent scheme.

394. Plaintiff suffered extensive financial injuries as a result of Defendants' misconduct.

395. As a result of Defendants' fraudulent actions, Plaintiff has been damaged and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Fraudulent Conspiracy Against All Defendants**

396. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

397. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct in support of their conspiracy. Plaintiff reasonably relied on those statements and omissions to her detriment.

398. Defendants engaged in a fraudulent conspiracy to wrongfully deprive Plaintiff of her money, including the Distribution Agreement Funds and the Music Video Funds.

399. Knowing that Plaintiff did not have a bank account, Daniel Hernandez told Plaintiff that he would help her by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control.

400. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez' brother, would help her and would not take acts to defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

401. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

402. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

403. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' conspiracy and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

404. Defendants used the Cliq Agreement to perpetuate their fraudulent conspiracy. Daniel and Oscar Hernandez drugged Plaintiff to get her to sign the signature page of the Cliq Agreement; knowingly and intentionally lied to Plaintiff by telling her it was a document she needed to sign so that they could open a bank account for her; concealed the actual terms of the Cliq Agreement from Plaintiff (to the extent such terms actually existed), including by failing to give her anything but the signature page; and then (along with Zaied) used the Cliq Agreement to convince

Cliq Management's in-house accountant that the transfers Defendants were ordering from Plaintiff's Cliq Management account were legitimate.

405. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had the Distribution Agreement Funds transferred to an account held by Cliq Management. That account was in Defendants' control, not Plaintiff's.

406. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff. However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

407. Defendants diverted the $190,000 Music Video Funds to their own pockets for their own personal uses.

408. Daniel Hernandez knowingly and intentionally lied to Plaintiff on numerous occasions by telling her that he was using or would use his own funds to

pay for certain expenditures, when in fact Defendants were using or would use Plaintiff's funds without Plaintiff's authorization. All Defendants were aware of these lies and helped conceal them from Plaintiff.

409. To induce Plaintiff to continue letting them hold her funds, spend her money, and perpetuate their fraudulent conspiracy, Defendants (including Daniel Hernandez, Oscar Hernandez, and Zaied) fabricated Cliq Management account statements and lied to Cliq Management's in-house accountant.

410. Zaied was deeply involved in the aspects of the conspiracy involving the movement of money, including the transfers to, from, and between the Cliq Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

411. Having taken control of Plaintiff's funds, each Defendant had a duty to disclose the other Defendants' wrongful conduct to Plaintiff. Instead, each Defendant worked to perpetuate their fraudulent scheme and benefit from it.

412. Defendants knew that all these false statements and omissions were material and they intended for Plaintiff to rely on them.

413. Plaintiff reasonably relied on Defendants' false statements and omissions.

414. Moreover, after Plaintiff filed her Complaint, Zaied and possibly Oscar Hernandez deleted emails and destroyed documents with the intent of perpetuating and concealing their fraudulent scheme.

415. Plaintiff suffered extensive financial injuries as a result of Defendants' misconduct.

416. As a result of Defendants' fraudulent conspiracy, Plaintiff has been damaged and is entitled to compensatory damages and punitive or exemplary damages in an amount to be proven at trial.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Constructive Fraud Against All Defendants**

417. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

418. A confidential or fiduciary relationship existed between Defendants and Plaintiff, including because Defendants undertook to help Plaintiff open a personal bank account, agreed to give her assistance and advice, knew that she did not speak English and had no experience with the U.S. banking system, and purported to act as agents for Plaintiff. In addition, Defendants told Plaintiff that they were providing her with information about the status of her account and bank card.

419. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct.

420. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct. Plaintiff reasonably relied on those statements and omissions to her detriment.

421. Defendants engaged in a fraudulent scheme to wrongfully deprive Plaintiff of her money, including the Distribution Agreement Funds and the Music Video Funds.

422. Knowing that Plaintiff did not have a bank account, Daniel Hernandez told Plaintiff that he would help her by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control.

423. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez' brother, would help her and would not take acts to defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

424. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

425. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

426. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

427. Defendants used the Cliq Agreement to perpetuate their fraud. Daniel and Oscar Hernandez drugged Plaintiff to get her to sign the signature page of the Cliq Agreement; knowingly and intentionally lied to Plaintiff by telling her it was a document she needed to sign so that they could open a bank account for her; concealed the actual terms of the Cliq Agreement from Plaintiff (to the extent such terms actually existed), including by failing to give her anything but the signature page; and then (along with Zaied) used the Cliq Agreement to convince Cliq Management's in-house accountant that the transfers Defendants were ordering from Plaintiff's Cliq Management account were legitimate.

428. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had the Distribution Agreement Funds transferred to an account held by Cliq Management. That account was in Defendants' control, not Plaintiff's.

429. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos

for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff (the "Music Video Funds"). However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

430. Defendants diverted the $190,000 Music Video Funds to their own pockets for their own personal uses.

431. Daniel Hernandez knowingly and intentionally lied to Plaintiff on numerous occasions by telling her that he was using or would use his own funds to pay for certain expenditures, when in fact Defendants were using or would use Plaintiff's funds without Plaintiff's authorization. All Defendants were aware of these lies and helped conceal them from Plaintiff.

432. To induce Plaintiff to continue letting them hold her funds, spend her money, and perpetuate their fraud, Defendants (including Daniel Hernandez, Oscar Hernandez, and Zaied) fabricated Cliq Management account statements and lied to Cliq Management's in-house accountant.

433. Zaied was deeply involved in the aspects of the scheme involving the movement of money, including the transfers to, from, and between the Cliq

Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

434. Having taken control of Plaintiff's funds, each Defendant had a duty to disclose the other Defendants' wrongful conduct to Plaintiff. Instead, each Defendant worked to perpetuate their fraudulent scheme and benefit from it.

435. Defendants knew that all these false statements and omissions were material and they intended for Plaintiff to rely on them.

436. Plaintiff reasonably relied on Defendants' false statements and omissions.

437. Moreover, after Plaintiff filed her Complaint, Zaied and possibly Oscar Hernandez deleted emails and destroyed documents with the intent of perpetuating and concealing their fraudulent scheme.

438. Plaintiff suffered extensive financial injuries as a result of Defendants' misconduct.

**TWENTY-NINTH CAUSE OF ACTION**
**Conspiracy to Commit Constructive Fraud Against All Defendants**

439. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

440. Defendants knowingly entered into a conspiracy, the object of which was to, through constructive fraud, deprive Plaintiff of her assets for Defendants' own

personal gain. Each of the Defendants committed one or more acts and/or omissions in furtherance of the conspiracy.

441. A confidential or fiduciary relationship existed between Defendants and Plaintiff, including because Defendants undertook to help Plaintiff open a personal bank account, agreed to give her assistance and advice, knew that she did not speak English and had no experience with the U.S. banking system, and purported to act as agents for Plaintiff. In addition, Defendants told Plaintiff that they were providing her with information about the status of her account and bank card.

442. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct. Plaintiff reasonably relied on those statements and omissions to her detriment.

443. Defendants engaged in a fraudulent scheme to wrongfully deprive Plaintiff of her money, including the Distribution Agreement Funds and the Music Video Funds.

444. Knowing that Plaintiff did not have a bank account, Daniel Hernandez told Plaintiff that he would help her by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control.

445. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez' brother, would help her and would not take acts to defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed

Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

446. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

447. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

448. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

449. Defendants used the Cliq Agreement to perpetuate their fraud. Daniel and Oscar Hernandez drugged Plaintiff to get her to sign the signature page of the Cliq Agreement; knowingly and intentionally lied to Plaintiff by telling her it was a document she needed to sign so that they could open a bank account for her; concealed the actual terms of the Cliq Agreement from Plaintiff (to the extent such terms

actually existed), including by failing to give her anything but the signature page; and then (along with Zaied) used the Cliq Agreement to convince Cliq Management's in-house accountant that the transfers Defendants were ordering from Plaintiff's Cliq Management account were legitimate.

450. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had the Distribution Agreement Funds transferred to an account held by Cliq Management. That account was in Defendants' control, not Plaintiff's.

451. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff (the "Music Video Funds"). However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

452. Defendants diverted the $190,000 Music Video Funds to their own pockets for their own personal uses.

453. Daniel Hernandez knowingly and intentionally lied to Plaintiff on numerous occasions by telling her that he was using or would use his own funds to pay for certain expenditures, when in fact Defendants were using or would use Plaintiff's funds without Plaintiff's authorization. All Defendants were aware of these lies and helped conceal them from Plaintiff.

454. To induce Plaintiff to continue letting them hold her funds, spend her money, and perpetuate their fraud, Defendants (including Daniel Hernandez, Oscar Hernandez, and Zaied) fabricated Cliq Management account statements and lied to Cliq Management's in-house accountant.

455. Zaied was deeply involved in the aspects of the scheme involving the movement of money, including the transfers to, from, and between the Cliq Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

456. Having taken control of Plaintiff's funds, each Defendant had a duty to disclose the other Defendants' wrongful conduct to Plaintiff. Instead, each Defendant worked to perpetuate their fraudulent scheme and benefit from it.

457. Defendants knew that all these false statements and omissions were material and they intended for Plaintiff to rely on them.

458. Plaintiff reasonably relied on Defendants' false statements and omissions.

459. Moreover, after Plaintiff filed her Complaint, Zaied and possibly Oscar Hernandez deleted emails and destroyed documents with the intent of perpetuating and concealing their fraudulent scheme.

460. Plaintiff suffered extensive financial injuries as a result of Defendants' conspiracy and misconduct.

## THIRTIETH CAUSE OF ACTION
**Aiding and Abetting Constructive Fraud Against All Defendants**

461. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

462. Defendants, through their constructively fraudulent conduct alleged above, misappropriated Plaintiff's property as their own.

463. Defendants made false and misleading statements and misleading omissions of material fact and engaged in deceptive conduct. Plaintiff reasonably relied on those statements and omissions to her detriment.

464. Defendants engaged in a fraudulent scheme to wrongfully deprive Plaintiff of her money, including the Distribution Agreement Funds and the Music Video Funds.

465. Knowing that Plaintiff did not have a bank account, Daniel Hernandez told Plaintiff that he would help her by asking Oscar Hernandez and Zaied to open a bank account for Plaintiff in her name only and subject to her exclusive control.

466. Daniel Hernandez was famous and (falsely) held himself out to Plaintiff and the public as being wealthy, so Plaintiff reasonably believed that Defendants, including Daniel Hernandez' brother, would help her and would not take acts to

defraud her, acts that would reflect badly on Daniel. But Daniel Hernandez needed Plaintiff's money to continue living his lavish lifestyle because, unbeknownst to Plaintiff, he was broke.

467. Daniel Hernandez further told Plaintiff that he would use his celebrity and influence to get Iris Live to transfer the Distribution Agreement Funds to her new account, where it would not and could not be touched except by her. These were all lies to take control of Plaintiff's money, which Defendants always intended to steal and use for their own benefit.

468. Oscar Hernandez and Zaied agreed to help Daniel Hernandez execute his scheme to defraud Plaintiff, advised him on how to fraudulently gain control over Plaintiff's funds and spend them without her knowledge, and helped him conceal and execute each step of the plan.

469. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

470. Defendants used the Cliq Agreement to perpetuate their fraud. Daniel and Oscar Hernandez drugged Plaintiff to get her to sign the signature page of the Cliq Agreement; knowingly and intentionally lied to Plaintiff by telling her it was a document she needed to sign so that they could open a bank account for her; concealed

the actual terms of the Cliq Agreement from Plaintiff (to the extent such terms actually existed), including by failing to give her anything but the signature page; and then (along with Zaied) used the Cliq Agreement to convince Cliq Management's in-house accountant that the transfers Defendants were ordering from Plaintiff's Cliq Management account were legitimate.

471. Rather than create a bank account solely in Plaintiff's name and under her exclusive control, Defendants had the Distribution Agreement Funds transferred to an account held by Cliq Management. That account was in Defendants' control, not Plaintiff's.

472. In mid-March 2024, Daniel and Oscar Hernandez, individually and on behalf of all Defendants, contacted Equity Distribution to request certain funds available through the Distribution Agreement to fund the production of music videos for Plaintiff. Using the Cliq Agreement, Daniel and Oscar Hernandez falsely represented that they were authorized as Plaintiff's managers to request and receive these funds. In turn, Equity Distribution transferred $190,000 to Defendants for purposes of producing music videos for Plaintiff (the "Music Video Funds"). However, Daniel and Oscar Hernandez never told Plaintiff that they were requesting these funds, never obtained Plaintiff's authorization to do so, and never told Plaintiff about the $190,000, which they never provided to Plaintiff. Instead, they lied and told Plaintiff that Daniel Hernandez and Cliq Management were paying the cost of her music videos, at no cost to Plaintiff.

473. Defendants diverted the $190,000 Music Video Funds to their own pockets for their own personal uses.

474. Daniel Hernandez knowingly and intentionally lied to Plaintiff on numerous occasions by telling her that he was using or would use his own funds to pay for certain expenditures, when in fact Defendants were using or would use Plaintiff's funds without Plaintiff's authorization. All Defendants were aware of these lies and helped conceal them from Plaintiff.

475. To induce Plaintiff to continue letting them hold her funds, spend her money, and perpetuate their fraud, Defendants (including Daniel Hernandez, Oscar Hernandez, and Zaied) fabricated Cliq Management account statements and lied to Cliq Management's in-house accountant.

476. Zaied was deeply involved in the aspects of the scheme involving the movement of money, including the transfers to, from, and between the Cliq Management bank accounts. Daniel Hernandez relied on Oscar Hernandez and Zaied to find sources of funding for his lavish expenditures. Oscar Hernandez and Zaied knowingly and intentionally committed theft and fraud to obtain those funding sources, which they also used for their own personal benefit.

477. Having taken control of Plaintiff's funds, each Defendant had a duty to disclose the other Defendants' wrongful conduct to Plaintiff. Instead, each Defendant worked to perpetuate their fraudulent scheme and benefit from it.

478. Defendants knew that all these false statements and omissions were material and they intended for Plaintiff to rely on them.

479. Plaintiff reasonably relied on Defendants' false statements and omissions.

480. Moreover, after Plaintiff filed her Complaint, Zaied and possibly Oscar Hernandez deleted emails and destroyed documents with the intent of perpetuating and concealing their fraudulent scheme.

481. Plaintiff suffered extensive financial injuries as a result of Defendants' misconduct.

482. Each Defendant had actual knowledge of the fraudulent scheme they were involved in carrying out against Plaintiff.

483. Without the substantial assistance of each other as co-Defendants, they could not have carried out this constructive fraud with the same level of efficacy – the complexity of the schemes they employed required deft coordination amongst themselves.

484. As a result of Defendants' constructive fraud, and their co-Defendants' assistance in carrying out the fraudulent schemes, Plaintiff suffered economic losses in an amount to be proven at trial.

**THIRTY-FIRST CAUSE OF ACTION**
**Breach of Contract Against Cliq Management**
**(in the alternative)**

485. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

486. If, in the alternative, if the Cliq Agreement is valid and enforceable, then Cliq Management breached the agreement, including by failing to provide the requisite services.

487. Plaintiff has suffered damages as a result of Cliq Management's breaches.

**THIRTY-SECOND CAUSE OF ACTION**
**Breach of Fiduciary Duty Against All Defendants**
**(in the alternative)**

488. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-114 as if fully set forth herein.

489. If, in the alternative, the Cliq Agreement is valid and enforceable, then Defendants owned Plaintiff's fiduciary duties as Plaintiff's agents and managers.

490. Defendants breached those fiduciaries duties, including by stealing from and defrauding Plaintiff.

491. Daniel Hernandez, Oscar Hernandez, and Zaied are not protected by Cliq Management's corporate form. Oscar Hernandez and Zaied created Cliq Management in February 2024 for the purpose of implementing Defendants' scheme and used it for that purpose. Daniel Hernandez, Oscar Hernandez, and Zaied dominated and controlled Cliq Management such that Cliq Management did not have an independent existence from Daniel Hernandez, Oscar Hernandez, and Zaied, who ignored corporate formalities and commingled corporate funds with personal funds.

## PRAYER FOR RELIEF

**WHEREFORE**, for all of the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

a. Awarding Plaintiff compensatory damages and restitution jointly and severally from each Defendant, in an amount to be determined at trial, but no less than $1,000,000, plus pre- and post-judgment interest;

b. Awarding Plaintiff between $10,000,000 to $20,000,000 in punitive and exemplary damages;

c. Entering a permanent injunction against Defendants, enjoining each against any use or distribution of any intimate visual depiction of Plaintiff;

d. Entering a permanent injunction against Defendants, enjoining each against any use or distribution of any unauthorized use of photographs of Plaintiff or Jane Doe;

e. Awarding Plaintiff her reasonable costs and expenses incurred in this action, including attorneys' fees; and

f. Awarding such other and further relief as this Court may deem just and proper.

Dated: February 21, 2025

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by CM/ECF on February 21, 2025, on all counsel or parties of record on the service list.

**REED SMITH LLP**

*A. Scott Bolden, Esq.*
A. Scott Bolden, Esq.
Rizwan A. Qureshi, Esq.
1301 K Street NW
Suite 1000, East Tower
Washington, DC 20005
Telephone: (202) 414-9200
Fax: (202) 414-9299
Email: abolden@reedsmith.com
Email: rqureshi@reedsmith.com

*Daniel A. Sox, Esq.*
Daniel A. Sox, Esq.
Florida Bar No: 108573
200 South Biscayne Boulevard
Suite 2600
Miami, FL 33131
Telephone: (786) 747-0200
Email: dsox@reedsmith.com

*Counsel for Plaintiff*